UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER M. LUCAS, | : | |
| | : | Case No. 1:14-cv-70 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| GREGG APPLIANCES, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER:**
**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT (Doc. 26) AND (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 32)**

This civil action is before the Court on (1) Plaintiff's Motion for Summary Judgment (Doc. 26) and the parties' responsive memoranda (Docs. 35, 36), and (2) Defendant's Motion for Summary Judgment (Doc. 32) and the parties' responsive memoranda (Docs. 34, 37).

## I. STATEMENT OF THE CASE

Plaintiff Christopher M. Lucas filed this action against Defendants Gregg Appliances, Inc. and Gregg Appliances, Inc. d/b/a hhgregg (collectively "Defendant") on January 21, 2014. (Doc. 1). Plaintiff alleges that Defendant violated the Americans with Disability Act, 42 U.S.C. §§ 12101, *et seq.*, and corresponding Ohio law, Ohio Rev. Code §§ 4112.01, *et seq.* (*Id.*)

## II. UNDISPUTED FACTS[1]

1. Plaintiff has shy bladder syndrome, which is formally known as paruresis. (Doc. 19 at 68-69).

2. Plaintiff first became aware of his condition when he was unable to urinate in a public restroom as a child. (*Id.* at 70).

3. Plaintiff learned to cope with this condition by holding it all day and waiting until he is home or using a stall for privacy. (*Id.* at 70-71).

4. Plaintiff admits, however, that at some point he physically cannot hold his urine in any longer and he is able to urinate in a public restroom. (*Id.* at 71-78).

5. Plaintiff had difficulty urinating in the public restroom at work almost every day and he preferred for the restroom to be empty, but that at times he was able to urinate when someone else was present in the restroom. (*Id.* at 70-73).

6. Plaintiff first discussed the symptoms of his shy bladder syndrome with a doctor on March 14, 2013, one day after he was terminated, because he had not felt the symptoms were serious enough. (*Id.* at 45, 81-82).

7. Defendant is a retailer of home appliances, consumer electronics, and furniture. It operates stores in the Midwest, Northeast and Southeast United States.

8. Defendant has a Drug-Free/Alcohol-Free Workplace Policy ("Drug-Free Policy") that applies to all associates. (Doc. 29, Ex. 3).

9. The Drug-Free Policy provides: "Any associate who refuses to submit to any type of testing when requested by the Company will be discharged for insubordination." (*Id.*, Ex. 3 at 3).

10. Defendant's Associate Conduct Policy similarly states that violation of the Company's Drug-Free Policy and insubordination are violations that may result in discipline, up to and including discharge. (Doc. 32, Ex. E, Attachment 1).

11. Plaintiff acknowledged his receipt and understanding of the Associate Handbook on September 7, 2009. (Doc. 19 at 60-61, Ex. 1).

12. Plaintiff read the Associate Handbook, and admits that as a manager, he knew what was contained within, and he was in charge of enforcing its contents from time to time. (*Id.*)

[1] *See* Docs. 32-2 and 33.

13. Defendant hired Plaintiff on September 7, 2009 into its Manager-in-Training ("MIT") Program. (Doc. 1 at ¶ 8; Doc. 6 at ¶ 8).

14. Although company policy requires pre-employment drug tests, Plaintiff was not tested. (*Id.* at 82).

15. The MIT Program prepares future management employees by providing sales training, operations training, distribution centers training, and assistant management training. (Doc. 19 at 55).

16. Within the company, a sales manager reports to the general manager, and the general manager reports to the regional manager. (*Id.* at 58-59).

17. After Plaintiff completed the MIT Training Program, he became the Assistant Manager of the Fields Ertel, Ohio store. (*Id.* at 56).

18. Afterward, Plaintiff became an Electronic Sales Manager at the Hamilton, Ohio store, and in July 2011, Plaintiff transferred to the Colerain, Ohio store in the same position. (*Id.* at 56-58).

19. Plaintiff's direct supervisor at the Colerain store was General Manager Mike Williams, and his second-level supervisor was Regional Manager Craig Ukman. (Doc. 30 at 9-10, 13-14).

20. On March 9, 2013, Ukman told Plaintiff that Plaintiff had been approved for a promotion to General Manager of the Hamilton store contingent on passing a drug test and background screen. (Doc. 19 at 58, 82-83; Doc. 30 at 35, 70-72, Ex. 7).

21. Plaintiff's first day of work at the Hamilton store was scheduled for March 11, 2013. (Doc. 1 at ¶ 11; Doc. 6 at ¶ 11).

22. However, Plaintiff knew that his promotion was contingent on successfully completing a drug test and his start date as a general manager was postponed pending completion of the test. (Doc. 1 at ¶¶ 11, 18; Doc. 6 at ¶¶ 11, 18).

23. Plaintiff would have reported directly to Ukman if the promotion was finalized. (Doc. 19 at 58).

24. An employee's manager schedules the drug test date, time, and clinic through an electronic system called eScreen, which generates an eScreen form, or "epassport," that the employee is required to take to the drug test and present to the facility. (Doc. 27 at 39-40, 43, Ex. 1; Doc. 29 at 48:7-16; Doc. 30 at 76).

25. Employees cannot schedule or reschedule their own drug tests. (Doc. 30 at 78; Doc. 32, Ex. E at ¶ 3).

26. After a manager requests an eScreen, the employee has 24 hours to report to the drug testing facility and take a screening test. (Doc. 29 at 49-50; Doc. 30 at 134).

27. Plaintiff's direct supervisor, General Manager Mike Williams, scheduled Plaintiff's drug screen. (Doc. 29 at 47-48, Ex. 9; Doc. 30 at 75-76).

28. On March 11, 2013, Plaintiff was scheduled to work in his role as Electronic Sales Manager from 8 a.m. to 6 p.m. at the Colerain store, which Plaintiff opened that day. (Doc. 19 at 83, 85).

29. Plaintiff was scheduled to leave the Colerain store for his drug test scheduled at Doctor's Urgent Care (the "clinic") at 10:00 a.m. that day. (Doc. 19 at 83-84; Doc. 27 at 25-26).

30. Plaintiff was permitted to leave work for as long as it took to complete the drug test and did not have to return by a specific time. (Doc. 19 at 85-86; Doc. 20 at 117-18).

31. Plaintiff drank approximately 40 ounces of soda and had not urinated prior to arriving at the clinic. (*Id.* at 93).

32. Plaintiff reported to the clinic before noon on March 11, 2013, and presented the ePassport. (*Id.* at 87-88, 91; Doc. 20 at 167, Ex. 4).

33. A clinic technician, Mindy Bell, gave Plaintiff a cup in which to deposit his urine specimen, and escorted him to a private restroom, where he was asked to provide the urine specimen with the door closed. (Doc. 19 at 32-33, 92-93, 99-100, Ex. 3 at ¶ 6, Ex. 4).

34. Plaintiff was alone in the restroom and attempted to provide a urine specimen for approximately five minutes, but he did not produce one. (Doc. 20 at 101).

35. Plaintiff advised Bell he could not produce a urine specimen, told her he had a shy bladder, and asked to be given a second opportunity. (Doc. 19, Ex. 3 at ¶ 6; Doc. 20 at 101).

36. Plaintiff consumed five large glasses of water and waited for approximately one and a half hours before making a second attempt. (Doc. 19 at Ex. 3 at ¶ 7; Doc. 20 at 101-03; Doc. 27 at 61-62, Ex. 1).

37. Plaintiff was given a second opportunity to produce a urine specimen in a private restroom. (Doc. 27 at 63-64).

38. Plaintiff told Bell he was again unable to produce a urine specimen on the second attempt. (Doc. 19, Ex. 3 at ¶ 7; Doc. 20 at 103).

39. Bell told Plaintiff he still had one hour and 45 minutes left for testing, but Plaintiff left the clinic without providing a urine sample. (Doc. 20 at 105-07; Doc. 27 at 64, 67, Ex. 1).

40. Plaintiff told Bell that he intended to return the next day, and Bell told Plaintiff that this was agreeable to her, but that Plaintiff would need authorization from his employer to take a second test. (Doc. 19, Ex. 3 at ¶ 7).

41. Bell marked on the testing record that Plaintiff refused to test because he left before his time expired. (Doc. 27 at 65-70, 75-76).

42. The clinic records completed by Bell state:

> Refusal to test: Pt [patient] had shy bladder. Was given 16oz H2O @ 12:40 and 16oz H2O @ 1:55–Pt was still unable to produce sample. Pt then stated unable to wait and would reschedule test through employer. Was told it is considered a refusal to test if he left. Pt still decided to go, couldn't wait.

(*Id.*, Ex. 1 at 3).

43. Plaintiff understood that when he scheduled the drug test for March 11, 2013, he needed to complete the test within 24 hours because Plaintiff had previously sent new employees for drug tests pursuant to company policy. (Doc. 1 at ¶ 15; Doc. 19 at 86-87).

44. After leaving the clinic, Plaintiff went directly to work, which was five minutes from the clinic, and upon his arrival was able to urinate right away. (Doc. 19, Ex. 3 at ¶ 9; Doc. 20 at 110-13).

45. Plaintiff had previously been unable to provide a urine sample for a drug test with a prior employer, but was permitted to take a second test after he explained his condition to the supervisor. (Doc. 19 at 80).

46. Plaintiff never told any of Defendant's employees about this prior inability to provide a urine sample for a drug test. (Doc. 20 at 128-31).

47. Prior to leaving the clinic on March 11, 2013, Plaintiff had not told any of Defendant's employees that he had an impairment that affected his ability to complete a urine test. (Doc. 19, Ex. 3 at ¶ 9; Doc. 20 at 113).

48. On March 11, 2013, Theresa Snell, a Human Resources Assistant, received a Specimen Result Certificate from the clinic that provided the results of Plaintiff's test. (Doc. 28, Ex. 3).

49. The Specimen Result Certificate stated that the "Final Result Disposition" was "Refusal to test," and that "PER COLLECTOR: DONOR LEFT COLLECTION SITE BEFORE COMPLETION OF DRUG TEST." (*Id.*)

50. If an individual reports to the clinic for a drug test but leaves without providing a urine sample, the clinic reports the result as a refusal to test, regardless of the specific circumstances. (Doc. 29 at 57).

51. Snell called the clinic and the representative told Snell that Plaintiff was there for two hours and left because he was unable to produce a sample. (Doc. 28 at 34-35, 44-45, Ex. 4).

52. The clinic representative confirmed to Snell that Plaintiff had been told that leaving the clinic without providing a sample would be considered either a refusal to test or a failure to test. Snell testified that she would use the phrases refusal to test and failure to test interchangeably. (*Id.* at 34-36, 44-45).

53. The clinic also confirmed to Snell that they provided water to Plaintiff. (*Id.* at 47).

54. Snell emailed Donna Desilets, the Vice President of Human Resourcesm on March 11, 2013 at 3:09 p.m., stating:

> I have a gentleman that Craig [Ukman] is in the process of promoting by the name of Christopher Lucas. He was sent for a drug screen today. I got the results back that he refused to test. I spoke with the clinic and they said he was there for two hours and was unable to produce a sample so he left. Craig wants to send him again. However, this is considered a positive in our books. How would you like to proceed with this?

(*Id.*, Ex. 4).

55. Desilets called Snell into her office around 4:30-5:00 p.m. to ask follow up questions about Snell's email. (Doc. 29 at 13-15, 54-56).

56. Desilets asked Snell to call the clinic and get more information about Plaintiff's test results, including how long Plaintiff was at the clinic, what instructions the clinic gave Plaintiff, and whether there were any prior situations where the test results indicated that an employee had refused to test. (*Id.* at 13-15).

57. Also on March 11, 2013, Desilets had a phone conversation with Gary Eck, the Divisional Vice President, to let him know they were reviewing the circumstance and would make a determination. (*Id.* at 15-16).

58. Desilets called Eck because he was her direct partner in the field, and he knew that Plaintiff was up for a promotion to a general manager position. (*Id.* at 16).

59. Prior to emailing Desilets, Snell called Ukman to inform him that Plaintiff failed to provide a sample. (Doc. 30 at 91, 94).

60. Ukman called Plaintiff at approximately 4:00 p.m. on March 11, 2013. Plaintiff told Ukman everything that had occurred at the clinic, including that that he was there for several hours, that he drank several glasses of water, and that he left the clinic without producing a urine sample. (Doc. 19, Ex. 3 at ¶ 9; Doc. 20 at 113-15; Doc. 30 at 94-99).

61. Ukman reminded Plaintiff that his promotion was contingent upon successful completion of the drug test. (Doc. 19, Ex. 3 at ¶ 9; Doc. 20 at 114).

62. Plaintiff told Ukman that he was unable to provide a urine sample at the clinic even after drinking several glasses of water, but Plaintiff did not mention that he had ever had trouble urinating on a prior occasion. (Doc. 20 at 113-15).

63. Plaintiff told Ukman he planned to return to the clinic the next day for another urine drug test. (*Id.* at 114, 122).

64. Plaintiff, however, did not know whether Ukman had authority to allow a second drug test. Ukman did not have this authority. (Doc. 32, Ex. E at ¶ 4).

65. Ukman was the only employee of Defendant whom Plaintiff spoke with about his drug test on March 11, 2013. (Doc. 20 at 118).

66. In the morning of March 12, 2013, Snell relayed to Desilets the information that she had learned from the clinic representative. (Doc. 29 at 17-20, 24-25).

67. On the morning of March 12, 2013, Desilets made the decision to terminate Plaintiff's employment because his failure to provide a urine specimen violated the company's Drug-Free Policy. (*Id.* at 23-24).

68. When Desilets decided to terminate Plaintiff, she did not know or consider whether Plaintiff had a disability or any impairment. (*Id.* at 40).

69. Desilets knew only that Plaintiff had left the clinic without providing a sample. (*Id.* at 21).

70. Unknown to Desilets, on the morning of March 12, 2013, Sabrina Helterbrand, the Leave Administrator, had received an email from Plaintiff asking for login information to register for a second urine drug test. (Doc. 20 at 115-17, 196-98, Ex. 9; Doc. 32, Ex. F at 23-26, Ex. G).

71. Helterbrand forwarded Plaintiff's email to Snell because drug testing was Snell's responsibility, but Helterbrand did not respond directly to Plaintiff. (Doc. 32, Ex. F at 24-25, Ex. G).

72. Since Plaintiff had no authority to schedule his own drug screen, nor was he yet a general manager (which is required to receive access to the drug test registration system), Snell did not provide Plaintiff with the requested login information or respond to his email. (Doc. 20 at 117; Doc. 28 at 59-61, Ex. 6; Doc. 30 at 108-11, Ex. 14).

73. Plaintiff had no other contact with any of Defendant's employees on March 12, 2013. (Doc. 20 at 118).

74. On March 13, 2013, Plaintiff reported to work at the Hamilton store. (Doc. 1 at ¶ 18; Doc. 6 at ¶ 18).

75. Prior to March 13, 2013, Plaintiff had not requested to take his drug test by alternative means, such as a blood test or hair sample. Other than telling Ukman about his inability to provide a urine sample on March 11, 2013, Plaintiff had not told anyone he had previously been unable to provide or urine sample or that this impairment or condition had ever occurred before. (Doc. 20 at 118).

76. Desilets called Eck to tell him to have Ukman terminate Plaintiff, and Eck told Ukman to do so. (Doc. 30 at 103-04; Doc. 32, Ex. E at ¶ 6).

77. Ukman called Plaintiff on March 13, 2013, and asked him to meet later in the afternoon at the Tri-County store. (Doc. 20 at 126).

78. Plaintiff did not speak with anyone else that day about the testing or his condition. (*Id.* at 127).

79. On March 13, 2013, Ukman told Plaintiff that his employment was terminated. (*Id.* at 129; Doc. 30 at 103-04).

80. Ukman told Plaintiff that the company viewed Plaintiff's March 11, 2013 test results as a refusal to test. (Doc. 20 at 128-29, 160-61).

81. After Ukman informed Plaintiff that he was terminated, Plaintiff told Ukman that he had been coping with shy bladder syndrome for years and that his mother had the same condition. (*Id.* at 130-31; Doc. 30 at 58).

82. Other than describing his inability to provide a urine sample at the clinic on March 11, 2013, this was the first occasion when Plaintiff told Ukman or any other company employee that he had shy bladder syndrome. (Doc. 20 at 130-32; Doc. 30 at 58).

83. Plaintiff offered to take a blood test, provide a hair sample, or complete any other type of drug test. (Doc. 20 at 131).

84. Ukman told Plaintiff that he would relay this information to the relevant persons and see if there was anything he could do about the termination decision. (Doc. 20 at 129-30; Doc. 30 at 116).

85. Ukman spoke with Eck by telephone, who told Ukman to inform Desilets about the termination meeting. (Doc. 30 at 61-64).

86. On March 13, 2013 at approximately 8:00 p.m., Ukman emailed Desilets to inform her about the termination meeting and Plaintiff's statement that he had shy bladder. (*Id.* at 58-64, Ex. 15).

87. Desilets told Eck her decision was final. (Doc. 32, Ex. E at ¶ 7).

88. On March 14, 2013, Ukman called Plaintiff and told him the decision had been final, and that based on his failure to complete a drug screen, he remained terminated. (Doc. 30 at 120-22).

89. Defendant declined Plaintiff's post-termination proposals to take another type of drug test, provide a hair sample, or take another urine test. (Doc. 1 at ¶ 24; Doc. 6 at ¶ 24).

90. Plaintiff stated that if he knew he would be terminated for failure to successfully complete a drug test, he would have stayed at the clinic on March 11, 2013. (Doc. 19, Ex. 3 at ¶ 8).

91. Plaintiff admits he did not stay at the clinic on March 11, 2013 for the full amount of time provided to complete the test. (Doc. 20 at 135).

92. Although Plaintiff allegedly had difficulty with urine drug tests taken for different employers in 1994 and 2005, he told no one at Defendant that he may have difficulty or may need to take an alternate type of drug test because he was "embarrassed," and it had been so long since he had attempted a drug test that he "figured" he could "do it." (Doc. 19 at 78-80, 196).

93. On March 14, 2013, Plaintiff presented to his primary care physician, Dr. Rhazi K. Khodadad, M.D., who diagnosed him with "urinary hesitancy," and referred him to an urologist. (*Id.* at 45, Ex. 2).

94. The March 14, 2013, visit was the first time Plaintiff sought medical treatment because, in Plaintiff's opinion, his impairment had not been serious enough to consult with a doctor. (*Id.* at 81-82).

95. Plaintiff went to the urologist, Dr. Raymond Metzger, on March 18, 2013. Dr. Metzger's records read:

> The condition is described as [c]an not urinate on demand or in public place if he "knows" someone can hear him or knows they are in the room. No dysuria [i.e. painful urination] noted. Patient has been emptying well. He has no frequency. No hematuria is present. He has no nocturia. There is no straining with urination. There is a normal urinary stream. There is no stress incontinence. There is no urgency. There is no urgency incontinence. He sees Dr. [] Khodadad – Just spoke with no Tx to assist with his management.

Dr. Metzger's summary of findings provide:

> [H]as problem with 'shy bladder' issue, that affects his ability to give a urine for a job drug screen; no other voiding problems; will try some rapflow – otherwise no real urologic pathology; this is not uncommon a problem, it is just that for him it happens at an i[no]pportune time. Rapflo samples X 4 weeks given – will see if helps in challenging moments.

(Doc. 32, Ex. N).

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

## IV. ANALYSIS

Plaintiff alleges that Defendant violated the ADA by terminating his employment because of a disability and by failing to accommodate that disability. Title I of the ADA provides that a covered employee shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a *prima facie* case of employment discrimination through indirect evidence, Plaintiff must show (1) he is disabled, (2) otherwise qualified for the position, with or without reasonable accommodation, (3) suffered an adverse employment decision, (4) the employer knew or had reason to know of his disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011).[2] Under the *McDonnell Douglas* burden-shifting framework, if Plaintiff makes out a *prima facie* case, the burden shifts to Defendant to articulate a nondiscriminatory explanation

[2] The "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Accordingly, the Court will evaluate the claims concurrently.

for the employment action, and if Defendant does so, the burden shifts back to Plaintiff to prove that Defendant's explanation is pretextual. *Id.* at 259.

To establish a *prima facia* case of failure to accommodate, Plaintiff must prove that (1) he is disabled, (2) he is otherwise qualified for the position, with or without reasonable accommodation, (3) his employer knew or had reason to know about his disability, (4) he requested an accommodation, and (5) the employer failed to provide the necessary accommodation. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012). "Once a plaintiff establishes a *prima facie case*, the employer then bears the burden to demonstrate that any particular accommodation would impose an undue hardship." *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014).

**A. Knowledge of the Disability**

Defendant argues that it is entitled to judgment as a matter of law on Plaintiff's disability discrimination and failure-to-accommodate claims because the decision maker, Desilets, did not know or have reason to know that Plaintiff had a disability.[3] The ADA provides that discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). "[E]xisting

[3] Defendant also argues that Plaintiff has failed to show that he is disabled. Several courts prior to the 2008 ADA amendments held that paruresis is not a disability. *See, e.g.*, *Rathy v. Wetzel*, No. 13-cv-72, 2014 WL 4104946, at *6 (W.D. Pa. Aug. 19, 2014); *Terbush v. Massachusetts ex rel. Hampden Cnty. Sheriff's Office*, 987 F. Supp. 2d 109, 122 (D. Mass. 2013) (collecting cases). Plaintiff relies on an August 11, 2011, EEOC informal discussion letter for the proposition that Plaintiff's paruresis constitutes a disability under the more lenient definition of disability imposed by the 2008 amendments. *See* http://www.eeoc.gov/eeoc/foia/letters/2011/ada_definition_disability.html. The Court need not reach the issue because Plaintiff has failed to establish other essential elements of his claim.

case law makes clear that an employee cannot be considered to have been fired 'on the basis of disability' unless the individual decision-maker who fired the individual had knowledge of that disability." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013) (citing cases).[4] "Knowledge of an employee's symptoms, however, does not necessarily equate to knowledge of his disability." *Id.* at 369.

Here, construing the facts in the light most favorable to Plaintiff, he has failed to show that Desilets knew or should have known about his disability. The undisputed evidence demonstrates that Desilets knew that on March 11, 2013 that Plaintiff was unable to provide a urine sample at the clinic after drinking several glasses of water and that he left after about two hours. (Doc. 20 at 113-15; Doc. 29 at 13-24, 54-56). Plaintiff testified that his conversation with Ukman in the afternoon of March 11, 2013 was limited to describing his inability to provide a urine sample on that particular occasion. (Doc. 20 at 113-15). Plaintiff had previously been unable to provide a urine sample for a drug test with a prior employer. (Doc. 19 at 80). After Plaintiff was unable to produce a sample, he explained his condition to the supervisor and was permitted to take a second test. (*Id.*) However, the first time that Plaintiff told Ukman or anyone else in the company that he had shy bladder syndrome, or that his inability to urinate on request had occurred before, was during the March 13, 2013 meeting with Ukman after Plaintiff learned he had been terminated. (Doc. 20 at 130-32).

[4] "While the ADA Amendments Act of 2008, changed the language of the Act from prohibiting discrimination 'because of' disability to discrimination 'on the basis of' disability, this does not affect the reasoning of the pre-2008 decisions with respect to decision-maker knowledge. It is equally true that an employee cannot be fired 'on the basis of' his disability unless the individual firing him knows of that disability." *Id.* at 369 n.3 (internal citation omitted).

Plaintiff did not inform anyone about his condition prior to taking the test on March 11, 2013, nor did he explain his condition to Ukman in the afternoon after the test. (Doc. 20 at 113-15). Instead, Plaintiff simply attempted to reschedule another urine test. (*Id.* at 114; Doc. 32, Ex. G). It was only after Ukman informed Plaintiff that he was terminated on March 13, 2013 that Plaintiff relayed his condition and requested to take a blood test or provide a hair sample. (Doc. 20 at 118, 131).

The Court of Appeals has found the following circumstances insufficient to create a factual dispute about an employer's knowledge of a disability:

> [I]f Nilles's symptoms were severe enough to alert Dabney that Nilles had a disabling condition, one might be able to conclude that Dabney knew of Nilles's disability or at least had some generalized notion that it existed. But in the instant case, Dabney only knew that Nilles had taken two leaves of absence, each for less than a month and separated by over a year, and that Nilles was seeing several doctors and had had an MRI. This information does not strongly imply that Nilles had a permanent disability and is just as, if not more, consistent with the perception that Nilles simply was suffering from one or more temporary illnesses.

*Nilles*, 521 F. App'x at 369. Here, Desilets knew that on one particular occasion Plaintiff had been unable to provide a urine sample after drinking several glasses of water and that Plaintiff left the clinic even though he had the opportunity to stay longer. (Doc. 29 at 24). Plaintiff provided no basis for Desilets, Ukman, Snell, or any other employee to know that his inability to provide a urine sample on request had ever occurred previously. Plaintiff scheduled his urine test without indicating in any way that he had previously been unable to provide a sample. After the test on March 11, 2013, he attempted to schedule another urine test. Again, Plaintiff provided no indication that this had previously occurred. This is insufficient as a matter of law to create a factual dispute

over whether Desilets knew or should have known that Plaintiff had a disability. *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems, however, is not the same as knowing that the employee suffers from a disability.").[5]

**B. Requested an Accommodation**

Defendant argues that Plaintiff's failure-to-accommodate claim also fails because Plaintiff did not request an accommodation. "The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations." *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 679 (6th Cir. 2014). "Once the employee requests an accommodation, the employer has a duty to engage in an 'interactive process' to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. But if the employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered." *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84-85 (6th Cir. 2012) (internal citations omitted).

Here, it is undisputed that Plaintiff did not request to take an alternative drug test until after he was terminated. (Doc. 20 at 131-32). Despite having been unable to provide a urine sample for a drug test with a prior employer, Plaintiff did not request to

[5] *See also Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) ("The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.").

take a blood test or provide a hair sample until after Ukman informed Plaintiff of his termination. (*Id.*) Additionally, Plaintiff merely attempted to reschedule a second urine test. When Plaintiff attempted to reschedule a second urine test with Ukman, Plaintiff only stated the details of his inability to produce a urine sample on that specific occasion. It is undisputed that Plaintiff did not tell Ukman about his shy bladder syndrome or the ongoing nature of the conditions until after his termination on March 13, 2013. (*Id.* at 128-32). This is insufficient to trigger Defendant's duty to engage in an interactive process because Plaintiff's own testimony makes clear that Defendant had no knowledge that Plaintiff sought an accommodation for a disability. "Plaintiff's claim falls on the ground that he did not request *any* accommodation from Defendant prior to his termination." *Blazek v. City of Lakewood*, 576 F. App'x 512, 517-18 (6th Cir. 2014).

Although Plaintiff did request to take a second urine test prior to his termination, Plaintiff provided no basis for Defendant to suspect that this request was in any way related to a repeated or ongoing condition that Plaintiff had endured since childhood. Instead, the only information Plaintiff provided to Defendant was that he could not provide a urine sample after drinking several glasses of water and waiting two hours. The lack of any greater perspective or context combined with Plaintiff's attempt to schedule a second urine test for the next day belies his argument that Defendant refused to make a reasonable accommodation. Accordingly, Plaintiff has failed to show that he

requested a reasonable accommodation.[6]

**C. Legitimate Nondiscriminatory Reason and Pretext**

Even if Plaintiff showed a *prima facie* case of disability discrimination, he cannot show that his termination was pretextual. Defendant's proffered reason for terminating Plaintiff is that when he left the clinic without providing a urine sample he violated a company policy that states "[a]ny associate who refuses to submit to any type of testing when requested by the Company will be discharged for insubordination." (Doc. 29, Ex. 3 at 3). This is a legitimate nondiscriminatory reason for Plaintiff's discharge. Accordingly, Plaintiff must offer evidence suggesting that this reason is pretext.

Plaintiff may show that this legitimate nondiscriminatory reason is a pretext for discrimination by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay v. UPS*, 501 F.3d 695, 704 (6th Cir. 2007). The Sixth Circuit has retreated from formulaic application of these categories and stressed that they serve only as a tool to assist in the Court in addressing the ultimate inquiry: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2008).

[6] Plaintiff argues that Defendant and the clinic failed to comply with the provisions of 49 C.F.R. § 40.193(c) by not permitting him to cancel the test and see a physician. However, that regulation only applies to "parties who conduct drug and alcohol tests required by Department of Transportation (DOT) agency regulations." 49 C.F.R. § 40.1(a). Further, the clinic results certificate specifically states that Plaintiff's test was classified as "non-DOT" by the clinic. (Doc. 28, Ex. 3). Accordingly, the regulations have no bearing here.

Plaintiff contends that the proffered reason is pretextual and that Defendant actually terminated his employment because of his inability to complete a urine test. Plaintiff does not identify which of the three categories of pretext he alleges. However, it appears that Plaintiff contends that the proffered reason had no basis in fact because he alleges that Desilets improperly equated Plaintiff's failure to test with a refusal to test. Plaintiff contends that these are distinct scenarios and only the latter is specifically covered by the drug policy. (Doc. 29, Ex. 3 at 3).[7]

An employer may avoid a finding that its proffered nondiscriminatory reason was pretextual by invoking the honest belief rule. This requires the employer to "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). In determining whether an employer reasonably relied on the particularized facts then before it, courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006). "As long as the employer held

[7] The second category of pretext requires the employee to "admit the factual basis underlying the employer's proffered explanation and further admit that such conduct could motivate dismissal." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). However, Plaintiff did "not admit the factual basis underlying [Defendant's] proffered legitimate reason for his discipline, which eliminates the second category of pretext." *Id.* Similarly, the "third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Id.* Desilets testified that she could not recall another instance where a current employee reported to a drug test but did not provide a urine sample. (Doc. 29 at 37). Plaintiffs do not offer any evidence that would support an inference of this category of pretext.

an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Seeger v. Cincinnati Bell Tele. Co.*, 681 F.3d 274, 285-86 (6th Cir. 2012).

To prove pretext, the employee must allege "more than a dispute over the facts upon which the discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). If the employee is able to "produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Smith*, 155 F.3d at 807-08. The employee may make this showing by, for example, demonstrating "an error on the part of the employer that is too obvious to be unintentional." *Seeger*, 681 F.3d at 286.

Desilets, Snell, and Ukman all testified that the company considered a "failure to test" as synonymous with a "refusal to test." (Doc. 28 at 34-36, 44-45; Doc. 29 at 33-34; Doc. 30 at 30). Prior to making the decision to terminate Plaintiff on March 12, 2013, Desilets read Snell's email summarizing the results sent from the clinic, requested that Snell call the clinic to obtain further information, had at least two in-person conversations with Snell, and spoke on the telephone with Eck. (Doc. 29 at 13-25, 54-57, 72). Desilets understood that Plaintiff was at the clinic for about two hours but was allowed to stay longer, that he drank several glasses of water, and that he left the clinic without providing

a urine sample. (*Id.*) Plaintiff has failed to show any evidence suggesting that Desilets did not make a reasonably informed and considered decision. Additionally, Plaintiff cannot show that Desilets lacked an honest belief that leaving the clinic without providing a urine sample did not constitute a refusal to submit to a test as delineated in the Drug-Free Policy. (Doc. 29, Ex. 3 at 3). Accordingly, Defendant is entitled to judgment as a matter of law.

## V. CONCLUSION

Wherefore, for these reasons, Plaintiff's Motion for Summary Judgment (Doc. 26) is **DENIED** and Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this case is **CLOSED** in this Court.

**IT IS SO ORDERED**.

Date: 4/15/15

*s/ Timothy S. Black*
Timothy S. Black
United States District Judge